## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.


S.W.R. and W.A.L.R., minors, by and through their Conservator, Katharina M. Reed, on their

own behalf and on the behalf of the Estate of Addison Adam Reed, decedent; KATHARINA M.

REED, on her own behalf,

                Plaintiff,

v.

BOARD OF COMMISSIONERS, EL PASO COUNTY,

EL PASO COUNTY SHERIFF'S OFFICE,

BILL ELDER, in his individual and official capacities,

JOSEPH ROYBALL, in his individual and official capacities,

WELLPATH, LLC,  EL PASO COUNTY DETENTION CENTER HEALTH CARE

PROVIDER,

DELLA LYONS, LPN, in her individual and official capacities,

MICHAEL MOHR, NP, in his individual and official capacities,

HUNTER GRANT, RN, in his individual and official capacities

GEORGE SANTINI, MD, in his individual and official capacities

TABATHA COYLE, LPN, in her individual and official capacities,

DONIELLE CODINGTON, clinician, in her individual and official capacities,

CHRISTA VALDEZ, clinician, in her individual and official capacities,

EDWARD KEAVENY, clinician, in his individual and official capacities,

1

MELISSA CANTU, clinician, in her individual and official capacities,

CHRISTIE MATYAS, clinician, in her individual and official capacities,

MARIA GARCIA, clinician, in her individual and official capacities,

SHAWANA CHASE, clinician, in her individual and official capacities,

COURTNEY BRETSCHNEIDER, clinician, in her individual and official capacities,

SERENA LEAHMON, clinician, in her individual and official capacities, and

JOHN AND JANE DOES 1–10,

      Defendants.

---

## COMPLAINT AND JURY DEMAND

Plaintiffs Addison Adam Lee Reed, by and through its conservator Kathy Reed, WALR, a minor on their own behalf and on the behalf of the Estate of Addison Reed, decedent, SWR, a minor on their own behalf and on the behalf of the Estate of Addison Reed, decedent individually by and through their attorney, Patricia M. Perello, Attorney and Counselor at Law, complains against Defendants and requests a trial by jury as follows:

### I.   INTRODUCTION

1. Addison Adam Lee Reed was an inmate at the El Paso County Jail, ("CJC"), awaiting sentencing on a conviction of domestic violence and facing a probation revocation for a positive urinalysis for marijuana. Mr. Reed began experiencing diabetic ketoacidosis because of untreated diabetes. Despite Mr. Reed's declining health, Defendants ignored the diabetic ketoacidosis and its symptoms for days. During this

time, the symptoms and diabetic ketoacidosis grew worse.  Reed suffered intense pain and largely lost his ability to function.  Mr. Reed was provided minimal, if any, medical treatment over the four days he spent in custody prior to being transported to the emergency room at UC Health.

2. Over the course of several days, Mr. Reed's condition continued to decline dramatically as the diabetic ketoacidosis continued to debilitate him due to Defendants knowingly disregarding Mr. Reed's worsening symptoms over a four-day period. Defendants watched as Mr. Reed grew sicker, became less responsive, and more delirious.  Defendants watched as Mr. Reed lost his ability to communicate clearly and to respond; however, they failed to treat his worsening symptoms.  Mr. Reed was suffering acute diabetic ketoacidosis, but Defendants continued to ignore his life-threatening symptoms.

3. Defendants were familiar with Mr. Reed's diabetes including the pattern and symptoms of his diabetic ketoacidosis.  On June 8, 2019, during Mr. Reed's incarceration at CJC, he became upset and inconsolable due to his high blood glucose levels resulting in diabetic ketoacidosis.  Mr. Reed was observed in this state by Defendants as his condition deteriorated.  Ultimately, Mr. Reed was transported to UC Health emergency room in diabetic ketoacidosis where he required intravenous insulin and intubation.  Once again on August 25, 2020, Mr. Reed was in custody at CJC where Defendants observed Mr. Reed's physical condition deteriorating and, in response, he was taken to the medical unit CJC where he was uncooperative.  Mr. Reed was then transported to the UC Health Emergency Room where he was admitted

3

to the hospital for diabetic ketoacidosis.  Mr. Reed's behavior at the hospital was noted as uncooperative and inappropriate, the same symptoms exhibited at CJC. Mr. Reed was treated for his diabetic ketoacidosis at UC Health after which he was stabilized and returned to CJC.

4. Mr. Reed was again transported by ambulance to the UC Health Emergency Room on September 8, 2021.  Upon arrival at the Emergency Room, Mr. Reed was in diabetic ketoacidosis and at risk of losing his life.  Hospital workers and doctors identified the danger and administered proper treatment.  However, due to Defendants' failure to timely and properly obtain the appropriate medical treatment, Mr. Reed expired.

5. Defendants' actions caused Mr. Reed extraordinary and wholly avoidable pain and suffering and deprived him of his life and of the rights secured by both the Constitutions and the laws of the United States and State of Colorado.

## II.  JURISDICTION AND VENUE

6. This action arises under the Constitution and laws of the United States, including 42 U.S.C. secs. 1983 and 1988.  The Jurisdiction of this Court is further invoked pursuant to 28 U.S.C. secs. 1331, 1343, and 2201.

7. This Court has personal jurisdiction over all named Defendants as they either reside in or conduct systematic and continuous business within the State of Colorado. Moreover, Defendants interacted with one another and Plaintiff while operating under the terms of commercial contracts, the material terms and performance of which occurred in whole or in part in the State of Colorado.  Additionally, Defendants' contacts with the State of Colorado were purposeful and deliberate.

8. Venue is proper under 28 U.S.C. sec. 139l (b) because all the events and/or omissions giving rise to the claims contained herein occurred within the State of Colorado.

9. Supplemental pendent jurisdiction is based upon 28 U.S.C. sec. 1367 because the violations of federal law alleged are substantial and the pendant causes of action derive from a common nucleus of operative facts.

10. The state law claims in this matter are brought against private corporations and therefore no notice of claims was required under the Colorado Governmental Immunity Act ("CGIA").

### III.  PARTIES

*Plaintiffs*:

11. At all times relevant hereto, Plaintiff Addison Adam Lee Reed and other pertinent Plaintiffs were residents of the State of Colorado and citizens of the United States of America.

*El Paso County Defendants*:

12. *Defendant Board of Commissioners, El Paso County ("BOCC"),* is a governmental entity chartered under the laws of the State of Colorado.   Among other things, El Paso County, through the *El Paso County Sheriff's Office* ("Sheriff"), operates the El Paso County Criminal Justice Center, ("CJC" or "the jail'), located at 2739 East Las Vegas Street, Colorado Springs, CO 80906.

13. Defendant BOCC represents, oversees, and sets policy for El Paso County, Colorado. The BOCC contracted with Defendant Wellpath, LLC, to provide healthcare to the inmate at the jail.

14. Defendant Bill Elder, in his official capacity, was the El Paso County Sheriff and the final policy maker for El Paso County with respect to all matters concerning the Sheriff's Office and all its divisions, including CJC.  Sheriff Elder was responsible for training and/or supervising all other Defendants outside BOCC and all other employees of the El Paso Sheriff's Office working at the jail, and for ensuring the health and welfare of all persons held at CJC at the time of Plaintiff Mr. Reed's incarceration and death.

15. Defendant Joseph Roybal, in his official capacity, is the El Paso County Sheriff and the final policy maker for El Paso County with respect to all matters concerning the Sheriff's Office and all its divisions, including CJC.  Sheriff Roybal is responsible for training and/or supervising all other Defendants outside BOCC and all other employees of the El Paso Sheriff's Office working at the jail, and for ensuring the health and welfare of all persons held at CJC.

16. The El Paso County Sheriff and BOCC are collectively referred herein as "El Paso County," "El Paso County Defendants," or "the County."

17. Although the County has sought to privatize the provision of healthcare services to its population of pretrial detainees and post-conviction inmates, it has a non-delegable duty to provide constitutionally adequate care, cannot contract away its constitutional obligations, and is legally liable for the challenged deliberately indifferent policies and practices, and for the deliberate indifferent medical care of persons held in CJC, including Plaintiff Mr. Reed, by its Contractors, their agents, and employees.

*Corporate Defendant*:

18.  Defendant Wellpath, LLC, is a private Tennessee corporation doing business in the State of Colorado with its headquarters at 1283 Murfreesboro Road, Nashville, Tennessee, and its registered agent in Colorado, Corporate Creations Network, Inc., located at 155 East Boardwalk #490 in Fort Collins, Colorado.

19. Since January 1, 2020 Defendant Wellpath has contracted with El Paso County to provide medical services to its inmates and supervises and implements such care, Upon entering into contracts or subcontracts to provide medical and/or other services to El Paso County inmates and detainees, Wellpath assumed public functions, acted under color of state law, and is legally responsible for complying with all the requirements of the United States Constitution.

20. Defendant Wellpath is a proper entity to sue under 42 U.S.C.  sec. 1983 for its deliberately indifferent policies, practices, habits, customs, procedures, and training and supervision of staff, including individual Defendants, with respect to the provision of medical care and treatment for inmates.

21. Defendant Wellpath is also properly sued for its own negligence and the negligence of its agents and employees under state law.  Defendant Wellpath is vicariously liable for the acts and omissions of its medical workers and agents.

22. Wellpath is referred to as "Corporate Defendant."

23. El Paso County Defendants and Corporate Defendant are collectively referred to as the "Entity Defendants."

*Medical Providers*:

24. At all relevant times, Defendant Della Lyons, LPN [1], was a citizen of the United States and a resident of Colorado.  Defendant Lyons was an agent, employee, and/or subcontractor of Defendant Wellpath and was responsible for providing medical care to Plaintiff Mr. Reed during his incarceration.  At all material times, this Defendant was acting under the Color of State Law.

25. At all relevant times, Defendant Michael Mohr [2], NP, was a citizen of the United States and a resident of Colorado.  Defendant Mohr was an agent, employee, and/or subcontractor of Wellpath was responsible for providing medical care to Plaintiff during his incarceration.  At all material times, this Defendant was acting under the Color of State Law.

26. At all relevant times, Defendant Hunter Grant, RN [3], was a citizen of the United States and a resident of Colorado.  Defendant Grant was an agent, employee, and/or contractor of Defendant Wellpath and was responsible for providing medical care to Mr. Reed during his incarceration.  At all material times, this Defendant was acting under the Color of State Law.

27. At all relevant times, Defendant George Santini, MD [4], was a citizen of the United States and a resident of Colorado.  Defendant Santini was an agent, employee, and/or contractor of Defendant Wellpath and was responsible for providing medical care to Mr. Reed during his incarceration.  At all material times, this Defendant was acting under the Color of State Law.

8

28. At all relevant times, Defendant Donielle Coddington, Clinician [5,] was a citizen of the United States and a resident of Colorado. Defendant Coddington was an agent, employee, and/ or subcontractor of Defendant Wellpath and was responsible for providing medical care to Plaintiff Mr. Reed during his incarceration. At all material times, this Defendant was acting under the Color of State Law.

29. At all relevant times, Defendant Christa Valdez, Clinician [6], was a citizen of the United States and a resident of Colorado. Defendant Valdez was an agent, employee, and/or sub- contractor of Defendant Wellpath and was responsible for providing medical care to Plaintiff Mr. Reed during his incarceration. At all material times, this Defendant was acting under the Color of State Law.

30. At all relevant times, Defendant Edward Keaveny, Clinician [7], was a citizen of the United States and a resident of Colorado. Defendant Keaveny was an agent, employee, and/or subcontractor of Defendant Wellpath and was responsible for providing medical care to Plaintiff Mr. Reed during his incarceration. At all material times, this Defendant was acting under color of State Law.

31. At all relevant times, Defendant Melissa Cantu, Clinician [8], was a citizen of the United States and a resident of Colorado. Defendant Cantu was an agent, employee, and/or subcontractor of Defendant Wellpath and was responsible for providing medical care to Plaintiff Mr. Reed during his incarceration. At all material times, this Defendant was acting under the Color of State Law.

32. At all relevant times, Defendant Tabatha Coyle, Clinician [9], was a citizen of the United States and a resident of Colorado. Defendant Cantu was an agent, employee,

and/or sub- contractor of Defendant Wellpath and was responsible for providing medical care to Plaintiff Mr. Reed during his incarceration.  At all material times, this Defendant was acting under the Color of State Law.

33.  At all relevant times, Defendant Christie Matyas, Clinician [10], was a citizen of the United States and a resident of Colorado.  Defendant Matyas was an agent, employee, and/or sub- contractor of Defendant Wellpath and was responsible for providing medical care to Plaintiff Mr. Reed during his incarceration.  At all material times, this Defendant was acting under the Color of State Law.

34.  At all relevant times, Defendant Maria Garcia, Clinician [11], was a citizen of the United States and a resident of Colorado.  Defendant Garcia was an agent, employee, and/or subcontractor of Defendant Wellpath and was responsible for providing medical care to Plaintiff Mr. Reed during his incarceration.  At all material times, this Defendant was acting under the Color of State Law.

35.  At all relevant times, Defendant Shawna Chase, Clinician [12], was a citizen of the United States and a resident of Colorado.  Defendant Chase was an agent, employee, and/or subcontractor of Defendant Wellpath and was responsible for providing medical care to Plaintiff Mr. Reed during his incarceration.  At all material times, this Defendant was acting under the Color of State Law.

36.  At all relevant times, Defendant Courtney Bretschneider, Clinician [13], was a citizen of the United States and a resident of Colorado.  Defendant Bretschneider was an agent, employee, and/or subcontractor of Defendant Wellpath and was responsible for providing medical care to Plaintiff Mr. Reed during his incarceration.  At all material

10

times, this Defendant was acting under the Color of State Law.

37. At all relevant times, Defendant Serena Leahman, Clinician [14], was a citizen of the United States and a resident of Colorado.  Defendant Leahman was an agent, employee, and/or subcontractor of Defendant Wellpath and was responsible for providing medical care to Plaintiff Mr. Reed during his incarceration.  At all material times, this Defendant was acting under the Color of State Law.

38. Defendants Lyons, Mohr, Grant, Santini, Coddington, Valdez, Keaveny, Cantu, Coyle, Matyas, Garcia, Chase, Bretschneider, 1-14.  Upon thorough review of the records, Plaintiff cannot ascertain the professions of these Defendants, thus Clinicians, and Leahman are referred to as "*Individual Medical Provider Defendants.*"

**CJC Staff**

39.  At all relevant times, John Does were citizens of the United States and residents of Colorado and an agent and/or employee of El Paso County, working as a Deputy with the El Paso County Sheriff's Office at CJC and acting under color of state law.

40. At all relevant times, Jane Does were citizens of the United States and residents of Colorado and an agent and/or employee of El Paso County, working as a Deputy with the El Paso County Sheriff's Office at CJC and acting under color of state law.

41. Defendants John Does and Jane Does are referred to herein as the "CJC Staff Defendants."  CJC Staff Defendants and Individual Medical Provider Defendants are collectively referred to as "Individual Defendants."

**Unknown Defendants to be Named**:

11

42. Plaintiff conducted a diligent search prior to filing this Complaint. However, according to information and belief, there are former and current employees of El Paso County and Corporate Defendants whose identities are currently unavailable to them. As a result, Plaintiff will timely amend this Complaint during litigation upon discovery of additional proper defendants. Plaintiff has therefore additionally named John Does and Jane Does 1-10 as defendants in this action.

## IV. STATEMENT OF FACTS

43. For the purposes of this Complaint, "health care workers" includes Emergency Medical Technicians (EMT"), Registered Nurses ("RN"), Licensed Practical Nurses ("LPN"), Nurse Practitioners ("NP"), Physicians Assistants ("PA"), and Doctors, ("MD"). "Health care providers" as used herein, includes NPs, PAs, and MDs.

44. The need for jails to transport in timely fashion inmates suffering from deteriorating medical conditions to a hospital for higher level assessment and higher medical care is constant and recurring.

45. Evaluating and addressing the needs of inmates with diabetes exhibiting symptoms of diabetic ketoacidosis and other associated medical conditions, even if only to escalate the matter, is a usual and recurring task for health care and detention workers at CJC, and therefore is within the scope of recurring tasks and duties as assigned.

46. On September 3, 2021, Mr. Reed was incarcerated at CJC. From day one, CJC staff and health care workers knew Mr. Reed suffered from diabetes and that failure to provide reasonable accommodation and prompt medical attention could cause him serious injury or worse.

12

47. All reasonable health care workers know or should know that diabetes, if left untreated, leads to diabetic ketoacidosis causing serious injury and death. Patients like Mr. Reed with high blood glucose levels resulting from diabetes are well known to health care workers as being at high risk for diabetic ketoacidosis and its related symptoms. All reasonable health care workers know or should know that the signs of diabetic ketoacidosis include disorientation, confusion, dehydration, loss of consciousness, aggression, and other visible symptoms. All reasonable health care workers know or should know that symptoms like those exhibited by Mr. Reed need a higher level of evaluation and treatment than that which can be provided in jail.

48. EMTs and nurses do not diagnose or determine the cause of signs and symptoms. EMTs and nurses have a duty to convey any abnormal signs, symptoms, or vitals to a provider who can diagnose the cause of the variances. All health care workers know or should know that failure to communicate abnormal findings to a provider can cause serious injury or death.

49. Mr. Reed was a diabetic and was familiar to the CJC staff and health care workers from previous visits when he had been treated for his diabetes and diabetic ketoacidosis. Mr. Reed underwent a medical intake evaluation upon his arrival at CJC September 3, 2021. The provider, Della Lyons, recorded Mr. Reed's diabetes in his health and care records, and the proper care he would require to remain stable. This care included regular blood glucose level readings and insulin shots. A chronic cure notation was placed on Mr. Reed's file due to his diabetes. Records indicate that Donielle Coddington ordered Admelog insulin intradermally four times a day. The

13

order was approved by Michael Mohr, NP.   When Mr. Reed was initially screened on September 3, 2021, he reported that he took Levamir insulin, a long-acting insulin, twice daily, and Novalog insulin, a rapid response insulin as needed.

50.  Mr. Reed had a well-documented history of occurrences of diabetic ketoacidosis at CJC.   On June 8, 2019, just prior to Wellpath assuming the contract for CJC, Mr. Reed was agitated and was in his cell with four RNs trying to calm him down.   After four hours of unsuccessfully trying to calm Mr. Reed, he was referred to the Emergency Room for evaluation.   According to CJC medical notes, Mr. Reed was admitted to the hospital's ICU suffering from diabetic ketoacidosis and needed to be intubated.   These notes were part of Mr. Reed's permanent medical file at CJC.

51.  On August 25, 2020, after Wellpath had acquired the contract for CJC, Mr. Reed told Christine Mohr, Psy.D., that he had plans to eventually kill himself.   On August 26, 2020, Mr. Reed was in CJC medical and was uncooperative.   Michael Mohr, NP, ordered Mr. Reed transported to the hospital where he was treated for diabetic ketoacidosis.   Mr. Reed's behavior was noted in his medical file as very inappropriate, yelling and screaming at the nurses.

52. Upon Mr. Reed's arrival at CJC on September 3, 2021, at 6:11 p.m., Della Lyons, LPN, recorded Mr. Reed's blood glucose level at 343, a high level for a blood glucose reading ("BGL").

53. On September 4, 2021, at 10:41 p.m., Mr. Reed's blood glucose level was recorded at 266, also high for BGL, by Courtney Bretschneider.   Mr. Reed received a dose of Admelog insulin that same evening at 10:38 p.m.   No other record exists of Mr. Reed

14

having his blood glucose level read or having any insulin administered on that day.

54. On September 5, 2021, at 3:58 a.m., Serena Leahmon recorded Mr. Reed's blood glucose level at 292, once again, a high level for BGL.  Mr. Reed was administered Admelog insulin shortly thereafter.

55. On September 5, 2021, at 2:45 p.m., Hunter Grant, RN, recorded Mr. Reed's blood glucose level at 410, an extremely concerning high level of BGL.  Mr. Reed was administered Admelog insulin shortly thereafter.

56. On September 5, 2021, at 3:48 p.m., Hunter Grant, RN, recorded Mr. Reed's blood glucose level at 330, which was still abnormally high for his BGL.  Admelog insulin was administered at that time.

57.  On September 5, 2021, at 9:46 p.m., Hunter Grant, RN, recorded Mr. Reed's blood glucose level at 331, which was well above the normal BGL.  Mr. Reed was administered Admelog insulin shortly thereafter.

58. On September 6, 2021, at 3:35 a.m., Christa Valdez, Clinician, reported that Mr. Reed did not report to the medical cart to have his blood glucose level metered, or to receive his Admelog insulin.

59.  On September 6, 2021, at 10:24 a.m., Shawna Chase, RN, recorded that while she was on the ward at approximately 7:45 a.m. Mr. Reed approached her regarding diabetic ketoacidosis.  Mr. Reed's blood glucose level was recorded at 329, once again a high level, and RN Chase indicated Mr. Reed appeared stable at that time.

60. At approximately 9:50 a.m., the deputy on duty called RN Chase about Mr. Reed complaining that he could not breathe and he was in diabetic ketoacidosis.  RN Chase

went to the ward to assess Mr. Reed.  Mr. Reed was uncooperative, his blood glucose level having risen to 376.  RN Chase recorded that Mr. Reed sat up when instructed; but would not keep his arm still when she was trying to take his blood pressure.  At 10:24 a.m., RN Chase reported that Mr. Reed appeared stable and to continue with normal blood glucose level metering and sliding scale insulin treatment.

61.  On September 6, 2021, at 1:09 p.m., Mr. Reed's blood glucose level was recorded at 410, a very high level. Absent from the records is any indication of who metered Mr. Reed's blood glucose level, or whether Mr. Reed was administered Admelog insulin at that time.

62.  On September 6, 2021, at 3:18 p.m., Hunter Grant, RN, noted on Mr. Reed's medical records that Mr. Reed had a blood glucose level of 410 due to Mr. Reed being unresponsive to the Admelog treatment.  RN Grant then administered 12 units of Admelog and took Mr. Reed's blood glucose level one hour later.  Mr. Reed's blood glucose level was still high at 404.  No additional insulin was administered at that time.  One hour later, RN Hunter's recheck of Mr. Reed's blood glucose level came back at 383--still a high BGL.  RN Grant administered another 10 units of Admelog, then noted that Mr. Reed was stable to return to the ward.

63.  On September 7, 2021, at 3:43 a.m., Melissa Cantu, Clinician, recorded that Mr. Reed was not present at the medical cart for his blood glucose level metering or Admelog insulin.

64. On September 7, 2021, at 4:19 p.m., Tabatha Coyle, LPN, recorded in Mr. Reed's medical records that he "was not in this ward for am med pass."  No additional record

was made at that time as to whether Mr. Reed's blood glucose level was metered at that time or Admelog administered.

65. On September 7, 2021, at 5:21 p.m., Shawna Chase, RN, noted in Mr. Reed's medical records that he approached the medical cart and began to lay his head down on top of it. RN Chase told Mr. Reed to step away from the medical cart until the ward deputy called everyone over and to stop leaning on the cart. Mr. Reed proceeded to walk over to one of the ward tables while cussing and stated, "this is fucking bullshit, fucking bitch." Mr. Reed then slammed both hands on the ward table, sat down, then was observed falling to the floor. The ward deputy called a "code blue." Mr. Reed appeared alert and was talking the whole time and RN Chase noted that Mr. Reed refused to let her administer a blood glucose level metering at that time. Mr. Reed was determined to be sufficiently stable to stay on the ward.

66. On September 7, 2021, at 4:42 p.m., Edward Keaveny, Clinician, placed a mental health note in Mr. Reed's file indicating Mr. Reed was placed on a yellow sheet for reportedly asking his cellmate to kill him, then stating he would do it himself.

67. On September 7, 2021, at 5:20 p.m., Tabatha Coyle, LPN, recorded a medical note that a "code blue" had been called in Mr. Reed's ward. Mr. Reed was reportedly laying on his back in bed. Mr. Reed did not respond to his name being called; but was alert after a sternum rub was administered and was able to sit up on his own. His blood glucose level read "HI" on the meter and 12 units of Admelog were administered subcutaneously. Mr. Reed was noted to be talking and responding appropriately before he was left in the ward.

68. On September 8, 2021, at 12:48 p.m., Christie Matyas, Clinician, recorded that Mr. Reed was brought to medical after he was unresponsive to deputies.  Deputies noted that Mr. Reed had soiled himself but was able to shower on his own accord and walk back to his bunk.  Mr. Reed then became unresponsive to the deputies.  Mr. Reed was brought down to medical in a wheelchair and was unresponsive to a sternal rub.  Mr. Reed exhibited Kussmaul Breathing, was cold and clammy to the touch, had cold extremities, pulse thready, blood pressure was difficult to obtain, and a vein was not located to start an IV.  Mr. Reed's reading on the blood glucose meter was "HI."  His pupils were fixed and non-reactive equally.  George Santini, MD, was informed and saw Mr. Reed.  Medical notes indicate that Mr. Reed was taken to medical at 10:00 a.m. and an ambulance was called at 10:08 a.m.  At 10:21 a.m., the fire department arrived.  At 10:23 a.m., the ambulance arrived and started an IO line.  At 10:38 a.m., Mr. Reed was loaded into the ambulance, and at 10:39 a.m., the ambulance left CJC. The medical notes are provided at 10:45 a.m., UC Health "notified of patient."

69. On September 8, 2021, at 4:46 p.m., a medical note entered by Clinician Matyas at CJC stated Mr. Reed was going to be admitted at UC Health.

70. On September 9, 2021, at 9:00 a.m., Maria Garcia, Clinician, attempted to obtain a report from UC Health; but was unable to obtain one.

71. On September 12, 2021, at 8:47 a.m., according to a medical note entered by Bianca Blain Krafosky, the ICU nurse at UC Health would not give information regarding Mr. Reed.

18

72. On September 12, 2021, at 1:43 p.m., according to a medical note entered by Clinician Krafosky, a deputy called from Mr. Reed's hospital room.  Mr. Reed was reportedly on a ventilator and an attempt to remove him from sedation was unsuccessful. The report was brief as it was obtained from a non-medical deputy.

73. On September 12, 2021, at 4:16 p.m., according to medical notes entered by Clinician Krafosky, Jasmine, an RN at Memorial, reported that Mr. Reed was currently on vasopressors and intubated.   His insulin drip had been discontinued, so he was now on SQ administration.  Mr. Reed's temperature had been elevated and he was on antibiotics to treat a possible underlaying infection.

74.  On September 13, 2021, at 6:08 p.m., according to a medical note at CJC entered by Amanda Chapman-Shaw, she attempted to call Mr. Reed's room in ICU to obtain a report; but she was hung up on.

75. On September 27, 2021, while at UC Health, Mr. Reed died from medical complications brought on by the negligence or omissions of the medical care and treatment at CJC.  As a result of the negligent care and treatment at the hands of the medical staff and the jail staff at CJC, Mr. Reed's diabetic ketoacidosis resulted in his death.

*Allegations Relating to Monetary Liability:*

76.  Mr. Reed was incarcerated in CJC both before and after January 1, 2020, when the County contracted with Wellpath to provide medical care and services to detainees and inmates at CJC.

77.  Beginning January 1, 2020, when Wellpath assumed the contract to provide medical care and services to detainees and inmates at CJC, many of the medical staff at CJC who are relevant to this matter did not change because of the switch from the former provider, Armor, to the current provider, Wellpath.

78. The El Paso County Defendants and Wellpath maintained constitutionally deficient policies and failed to adequately train and supervise their employees with respect to proper procedures for the evaluation and treatment of CJC inmates and detainees with serious medical needs.

79. Entity Defendants understood there was a wide- spread pattern and practice of deliberately indifferent medical care at CJC and other Wellpath facilities.

80. The County awarded its medical contract to Wellpath on January 1, 2020, despite knowing that Wellpath had been sued over 50 times in recent years for failures leading to serious injury and death of detainees and inmates.  The County knew Wellpath would not make constitutionally adequate screening or medical decisions and was deliberately indifferent to the predictable consequences.

81. Each of the individual CJC Staff Defendants violated Mr. Reed's Eighth Amendment right to be free from deliberate indifference to his medical needs in essentially the same unconstitutional manner failing to refer him to immediate medical care despite needs so obvious that even a lay person would recognize the necessity of immediate medical attention while knowing that this failure created significant risk of illness or death. Similarly, each of the individual Medical Provider Defendants violated Mr. Reed's right to be free from deliberate indifference to his medical needs in essentially

the same unconstitutional manner, failing to adequately treat his significant medical problems, ignoring life-threatening symptoms, and failing to refer him for higher-level evaluation and treatment despite knowing that failing to do so put him at significant risk of serious illness or death.

*The County and Wellpath:*

82. In the time that Wellpath has been the medical provider for CJC, Wellpath's and the El Paso County Defendants' custom, policy, or practice of deliberate indifference and their lack of adequate training, supervision, and discipline regarding assessing and treating the serious medical needs of those in custody at CJC is evident.

83. In addition to their indifference to Mr. Reed's needs, Wellpath and El Paso County Defendants were deliberately indifferent to the needs of inmates and detainees from March 29, 2021, to September 27, 2021, when CJC was reporting one death per month. In addition to Mr. Reed, five other inmates, Travis Lowe, Justin Ferguson, Wayne Baca, Steven Thorne, and William Johnson, all died while in custody at CJC and while under the medical care of Wellpath.

84. By June 19, 2021, Wellpath had faced over 1400 federal lawsuits alleging death and poor care at jails across the country.

85. El Paso County Defendants have a non-delegable duty to provide sufficient medical care to inmates and detainees and therefore are liable for the unconstitutional actions of Wellpath and its employees toward Mr. Reed.

86. Wellpath's failure to deliver necessary medical care to Mr. Reed was motivated by constitutionally impermissible profit driven reasons. To maximize profits, Wellpath

had a widespread policy, practice, and custom of budgeting and spending inadequate amounts on jail medical care and delaying or declining to send inmates to the hospital or an outside specialist when proper medical protocol would dictate such action was necessary. The insufficient budgeting and spending in addition to the steadfast refusal to send inmates to the hospital or outside specialists would cause harm to the inmates and detainees in need of additional medical care. Such conduct caused or substantially contributed to Mr. Reed's unnecessary pain and suffering and led to his diabetic ketoacidosis to the point that it became life threatening and ultimately led to Mr. Reed's demise.

87. Wellpath failed to adequately train its personnel to recognize and respond to the serious medical needs of inmates and detainees. Wellpath also failed to train its nursing staff on how to conduct proper medical examinations. The need for such training was obvious and it was foreseeable that such training deficiencies would cause harm to detainees and inmates at CJC.

88. In the years prior to Mr. Reed's demise, Wellpath was aware of the alarming deficiencies in screening, staffing, monitoring, and the delivery of medical and mental health care that were identified in previous lawsuits. Despite this knowledge, Wellpath and its corporate officials chose not to rectify the problems thereby placing the lives of incarcerated inmates and detainees at risk.

89. The corporate policies, practices, and customs of Wellpath were a moving force behind Mr. Reed's prolonged and unnecessary suffering and demise, and the unconstitutional violations set forth in this Complaint.

22

90.  By the time the County hired Wellpath, it was well known that the for-profit medical provider had a custom, practice, and policy of disregarding and minimizing inmates' and detainees' medical complaints, depriving them of prescription medications, and failing to order diagnostic testing and/or to timely send inmates and detainees to the hospital or outside experts to save money.

91. In its contracts with facilities around the nation, Wellpath agrees to cover all costs, up to a limit, for detainees and inmates who require diagnostic testing and/or outside medical services.  This includes hospitalization and specialized treatment including hospitalization and specialized treatment for serious illnesses and/or medical emergencies.

### CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

Violation of 42 U.S.C. sec. 1983--Eighth Amendment Unconstitutional Lack of Medical Care

(Against Each Individual Medical Provider Defendant)

92. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

93. 42 U.S.C. sec. 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom, or usage of any state or territory or of the District of Columbia subjects or causes to

be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress.

94. Plaintiffs are citizens of the United States, and De-fendants to this claim are persons for the purpose of 42 U.S.C. sec. 1983.

95. Mr. Reed was an inmate.  As an inmate, he was protected from deliberate indifference to his well-known serious medical needs by the Eighth Amendment.

96. Private actors working in a jail do not have qualified immunity.  At all relevant times, the Individual Medical Providers knew of these clearly established constitutional rights of inmates and knew that their conduct violated clearly established law.

97. Each Individual Medical Provider Defendant, always relevant hereto, was acting under Color of State Law.

24

98. As a result of the allegations contained in this Complaint, the Individual Medical Provider Defendants are liable under 42 U.S.C sec. 1983 for violations of Mr. Reed's Eighth Amendment rights by acting with deliberate indifference of his serious medical needs and disregarding the excessive risks of serious harm and death described herein, despite being expressly aware of the excessive dangers to health and safety posed.

99. Each of the Individual Medical Provider Defendants subjectively knew about and was deliberately indifferent to the dangers posed that were intentionally and deliberately disregarded. These excessive risks were known or should have been known as these risks were obvious.

100. All Individual Medical Provider Defendants personally participated in the constitutional deprivations described herein by treating or failing to treat Mr. Reed's serious medical condition.

101. The acts or omissions of these Individual Medical Provider Defendants were the legal and proximate cause of Plaintiff's injuries and damages, including his avoidable and prolonged pain and suffering, the avoidable deterioration of his condition, and his ultimate demise.

102. As a direct and proximate result of these Individual Medical Provider Defendants' unlawful conduct, Mr. Reed has suffered injuries entitling him to recover compensatory and special damages, including for pain, suffering, and other special damages, all in amounts to be proven at trial.

103. Plaintiffs are entitled to attorneys' fees and costs pursuant to 42 U.S.C. sec. 1988,

prejudgment interest and costs as allowable by federal law.

104. Plaintiffs are also entitled to punitive damages against these Individual Medical Provider Defendants, in that their actions were taken maliciously, willfully, or with a reckless or wanton disregard of the constitutional rights of Plaintiffs.

### SECOND CLAIM FOR RELIEF

Violation of 42 U.S.C sec. 1983--Eighth Amendment

Unconstitutional Lack of Medical Care

(Against CJC Staff Defendants}

105.  Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

106.  Defendants to this claim are persons for the purposes of 42 U.S.C. sec. 1983.

107.  Each CJC Staff Defendant, at all times relevant hereto, was acting under Color of State Law.

108.  Mr. Reed was an inmate.  As an inmate, he had a clearly established right under the Eighth Amendment to be protected from deliberate indifference to his known serious medical needs.  At all relevant times, CJC Staff Defendants knew of these clearly established constitutional rights of inmates and knew their conduct violated clearly established law.  Any reasonable objective law enforcement or detention staff officer would or should have known of this clearly established law.

109.  These Defendants' actions and inactions deprived Mr. Reed of his Constitutional right to protection from deliberate indifference to his known serious medical needs.  These Defendants were deliberately indifferent to known and excessive risks of serious harm to Mr. Reed.

110.  For the reasons stated herein and incorporated by reference, CJC Staff Defendants are liable under 42 U.S.C. sec. 1982 for the violations of Mr. Reed's rights under the Eighth Amendment by acting with deliberate indifference to his serious medical

needs and disregarding the excessive risks of serious harm described herein, despite being expressly aware of the excessive dangers to health and safety posed. Any objectively reasonable officer would or should have known that these Defendants' conduct posed an excessive risk to the health and safety of Mr. Reed.

111. Each of the Defendants identified herein subjectively knew about and was deliberately indifferent to the dangers posed and thus deliberately and intentionally disregarded. These excessive risks were known or should have been known as these risks were obvious.

112. The acts or omissions of these Defendants were the legal and proximate cause of Mr. Reed's injuries and damages, including his avoidable and prolonged pain and suffering, the avoidable and prolonged diabetic ketoacidosis, the avoidable and prolonged deterioration of his condition, and the severe risk to his life.

113. As a direct and proximate result of these Defendants' unlawful conduct, Plaintiffs have suffered injuries and losses entitling them to recover compensatory and special damages, including for suffering, pain, and other special damages, all in amounts to be proven at trial.

114. Plaintiffs are entitled to attorneys' fees and costs pursuant to 42 U.S.C. sec. 1988, prejudgment interest, and costs as allowable by federal law.

115. Plaintiffs are also entitled to punitive damages against these Defendants in that their actions were malicious, willful, or with reckless or willful disregard of the constitutional rights of Plaintiffs.

### THIRD CLAIM FOR RELIEF

Violation of 42 U.S.C. sec. 1983--Eighth Amendment

Unconstitutional Policies and Failure to Train and Supervise

(Against Entity Defendants}

116. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

117. Entity Defendants were each, and at all relevant times, acting under Color of State Law.  Each Entity Defendant is a "person" within the meaning of 42 U.S.C. sec. 1983.

118. The liability of the El Paso County Defendants for the constitutional violations of Wellpath and its employees is non-delegable.

119.  Policies include written policies as well as customs, habits, training, and practices. The unconstitutional policies, customs, habits, training, and practices of Defendants to this claim resulted in the violation of Mr. Reed's Eight Amendment right to adequate medical care and to humane conditions of confinement.

120.  Entity Defendants knew or should have known that the aforementioned policies, habits, practices, training, and customs, as applicable to each, posed a substantial risk of serious harm to inmates such as Mr. Reed, and that the occurrence of such harm was obvious.   Nevertheless, Defendants failed to take reasonable steps to alleviate those risks of harm.   An affirmative causal link exists between the deliberate indifference of Individual Defendants toward Plaintiff's medical needs and the policies, practices, and customs described herein.  Such policies, practices, and customs were the moving force behind Individual Defendants' unconstitutional

conduct and the moving force behind and the legal and proximate cause of Plaintiff's injuries and damages.

121. In the light of the duties assigned to individual health care workers, the need for more or different training and supervision of said workers was obvious, and the failure to do  so by Entity Defendants was deliberately indifferent to the rights of the relevant public and a moving force in the suffering and death of Mr. Reed.

122. The unconstitutional acts and omissions of Entity Defendants were the moving forces in the unconstitutional acts of the Individual Defendants.

123. The acts or omissions of these Defendants were the legal and proximate cause of Mr. Reed's suffering and demise.

124.  As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff's suffered injuries and losses entitling them to recover compensatory and special damages, including for suffering,  pain, and other special damages, all in amounts to be proven in trial.

125. Plaintiffs are entitled to attorneys' fees and costs pursuant to 42 U.S.C. sec. 1988, prejudgment interest, and costs as allowable by federal law.

126.  Plaintiffs are also entitled to punitive damages against Wellpath in that their actions were malicious, willful, or with a reckless or wanton disregard of the constitutional rights of Plaintiffs.

## FOURTH CLAIM FOR RELIEF

Medical Negligence Causing Serious Bodily Harm and Death

(Against Individual Medical Provider Defendants and Corporate Defendant)

127. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

128. Corporate Defendant is a private corporation that contracts with El Paso County to provide medical care and health services to inmates and detainees at CJC. Individual Medical Provider Defendants are private individuals and not public officials or employees. Corporate Defendant and Individual Medical Provider Defendants are therefore not entitled to any immunity under the CGIA.

129. At all times relevant to this action, Mr. Reed was under medical responsibility, care, and treatment of the Individual Medical Provider Defendants and Corporate Defendant.

130. These Defendants had a duty to provide reasonable medical care and treatment to detainees and inmates at CJC, including Mr. Reed.

131. Corporate Defendant had the duty to exercise reasonable care in the training and supervision of its employees. These duties are informed by state law. Under C.R.S. sec. 16-3-401, "[p]ersons arrested or in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment." The provision of adequate medical treatment and humane care is a statutory obligation.

132. Through their acts and omissions, Individual Medical Provider Defendants and other care providers breached their duty of care when they knowingly failed to assess, monitor, treat, and care for Mr. Reed, even though he was in obvious need of immediate medical attention.

133. Individual Medical Provider Defendants had provider- patient relationships with the Plaintiff at all relevant times and were acting within the scope of their employment throughout the duration of these relationships.

134. With respect to the care and treatment of Mr. Reed, Individual Medical Provider Defendants owed him a duty to exercise the degree of care, caution, diligence, and foresight exercised by and expected of medical personnel in similar situations. Individual Medical Provider Defendants breached that standard of care and were negligent in failing to properly assess, monitor, treat, and care for Mr. Reed.

135. As a direct and proximate result of Individual Medical Provider Defendants having breached their duty to provide reasonable medical care and treatment to Mr. Reed, he suffered significant physical and mental pain and suffering resulting in death and other damages.

136. Corporate Defendant is vicariously liable for the negligent acts and omissions by its agents and/or employees, including, but not limited to, those named individually herein, and those directly liable for their own negligent failures in training, policies, and practices.

137. Corporate Defendant is also directly liable for the breach of duty to exercise reasonable care in the training and supervision or its employees and agents which

was likely to harm CJC inmates and detainees in need of medical care, including Mr. Reed.

138. Corporate Defendant knew or should have known of the lack of supervision, experience, and training among its employees and agents was likely to cause harm in the medical care of inmates, including that of Mr. Reed.

139. In failing to exercise reasonable care in the training and supervision of its employees and agents, as it relates to their providing reasonable medical care and treatment, Corporate Defendant was negligent and proximately caused Mr. Reed's suffering and injuries and death.

140. The negligent acts and omissions by Individual Medical Provider Defendants and Corporate Defendant were a substantial and significant contributing proximate cause of Mr. Reed's suffering, injuries, and death.

141. As a result of the negligence described herein, Plaintiffs suffered damages, losses, and injuries in an amount to be determined by the jury at trial.

142. The conduct of Individual Medical Provider Defendants and Corporate Defendant was attended by circumstances of malice, or willful and wanton conduct.

*PRAYER FOR RELIEF*

WHEREFORE, Plaintiffs pray that the Court award against Defendants:

a) All appropriate relief at law and equity.

b) Economic losses on all claims allowed by law.

c) All available compensatory and consequential damages, including, but not limited to, all available damages for pain and suffering, physical, mental, and emotional distress, and all other non-economic and economic damages available under the law.

d) Punitive damages on all claims as allowed by law and in an amount to be determined at trial.

e) Attorneys' fees and costs, including expert witness fees.

f) Pre- and post-judgment interest as appropriate; and

g) Any further relief at law or equity that this Court deems just and proper.

**PLAINTIFFS RESPECTFULLY REQUESTS TRIAL BY JURY**

Dated this 1st day of September 2023.

*/s/ Patricia M. Perello*

Patricia M. Perello

402 South Weber Street

Colorado Springs, CO 80903

Office: (719) 575-9757

PPerello1948@gmail.com

Attorney for the Plaintiffs

34